[Cite as *State v. Thompson*, 2010-Ohio-3278.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 08 CO 41 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| JOHN T. THOMPSON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from Common Pleas
Court, Case No. 08CR29.

JUDGMENT:      Affirmed.

APPEARANCES:
For Plaintiff-Appellee:      Attorney Robert L. Herron
Columbiana County Prosecutor
Attorney John Gamble
Attorney Kyde Kelly
Assistant Prosecutors
Columbiana County Courthouse
105 S. Market Street
Lisbon, OH 44432

For Defendant-Appellant:      Attorney Susan Gaetano Maruca
Attorney David J. Betras
6630 Seville Drive
Canfield, OH 44406

Attorney Dominic A. Frank
16233 St. Clair Avenue
East Liverpool, OH 43920

JUDGES:
Hon. Mary DeGenaro
Hon. Joseph J. Vukovich

Hon. Cheryl L. Waite

Dated:  June 30, 2010

DeGenaro, J.

{¶1}   This timely appeal comes for consideration upon the record in the trial court, the parties' briefs and their oral arguments before this Court.  Appellant, John Thompson, appeals the decision of the Columbiana County Court of Common Pleas convicting him of one count of drug trafficking and sentencing him accordingly.  Thompson's appointed counsel has filed a brief in this matter, and Thompson has filed a pro-se brief assigning additional errors.  Counsel argues that the trial court's decision to admit an audio tape of the controlled drug buy and to allow a witness to interpret what was said on the tape constitutes plain error.  He also argues that Thompson's conviction is against the manifest weight of the evidence, and that the trial court's *Howard* charge to the jury constitutes plain error.  Finally, counsel argues that Thompson's trial counsel was ineffective in that he neglected to file a motion to suppress, and failed to object to the admission of the audio tapes and to the *Howard* charge.  In his pro-se brief, Thompson claims his trial counsel was ineffective because he allegedly failed to research the background of the State's confidential informant.  Thompson also argues pro-se that his conviction was not supported by sufficient evidence, and that his sentence was erroneous.

{¶2}   Upon review, all of Thompson's counseled and pro-se assignments of error are meritless.  His conviction is not against the weight or sufficiency of the evidence. The trial court did not commit plain error by admitting an audiotape of the controlled buy, by allowing a witness to testify about it, or by its imposition of a *Howard* charge to the deadlocked jury.  Trial counsel provided constitutionally effective assistance. With regard to the sentencing issue, we presume the trial court considered the R.C. 2929.11 and 2929.12 principles and factors in sentencing Thompson because the record does not affirmatively demonstrate a lack of consideration, nor is the chosen sentence strikingly inconsistent with the statutory factors. Thompson's sentence is not otherwise contrary to law or an abuse of discretion.  Accordingly, the judgment of the trial court is affirmed.

**Facts and Procedural Background**

{¶3} On February 6, 2008, the Columbiana County Grand Jury indicted Thompson on one count of drug trafficking in violation of R.C. 2925.03(A)(1), a second-degree felony pursuant to R.C. 2925.03(C)(6)(d). This charge resulted from a controlled buy of heroin orchestrated by the Youngstown Drug Task Force, during which they utilized an informant. It was alleged that Thompson trafficked 50 unit-doses of heroin within 1000 feet of a school. Thompson was arraigned, pled not guilty, and counsel was appointed. A jury trial commenced on November 17, 2008.

{¶4} Special Agent Kim Nusser of the Ohio Bureau of Criminal Identification and Investigation (BCI) testified that the informant contacted law enforcement and told them he had set up a heroin purchase from Thompson. It was Agent Nusser's understanding that the purchase was to take place at the Columbiana County home of Andrea Parson, and that Thompson would use Parson as an intermediary for the transaction. Agent Nusser explained that during the course of his investigation he learned that Thompson often worked with someone else so as not to "dirty his hands."

{¶5} Agent Nusser, along with Officer Patrick Wright, met the informant at the Riverview Cemetery in East Liverpool on the morning of March 6, 2005. Once at the cemetery, the informant was carefully searched and he was provided with five hundred dollars with which he would purchase 50 unit-doses of heroin. The serial numbers on those bills were recorded. The informant was also equipped with a recording and transmitting device. The agents then followed the informant to Parson's house.

{¶6} Agent Nusser's role during the controlled buy was to provide general surveillance in the area, while several other detectives set up video surveillance in front of Parson's house and monitored the conversation that would be transmitted by the device worn by the informant. While driving around the area, Agent Nusser observed Thompson sitting in his car and talking on a cell phone approximately two blocks away from Parson's house.

{¶7} Once the controlled buy was accomplished, Agent Nusser followed the informant back to the cemetery where the informant delivered the heroin he had

purchased at Parson's home. The informant was again searched and no additional funds or contraband were discovered. The agents inventoried the heroin package and determined it contained 50 unit-doses. They performed a preliminary field test on one of the packets of heroin which revealed it was genuine. They subsequently sent the package to a BCI lab for further testing which confirmed the identity and amount of the substance. The marked bills were never recovered.

{¶8} Officer Patrick Wright of the East Liverpool Police Department and the Youngstown Drug Enforcement Task Force testified that prior to being contacted by the informant, his unit was aware of Thompson, "knew what his activities were," and wanted to pursue him. Officer Wright testified that his role during the controlled buy was to follow the informant and keep him under constant visual surveillance as he travelled to and from the Parson's house to effectuate the controlled buy. While the informant was inside Parson's house, Officer Wright drove around the area, and observed Thompson driving in the direction of Parson's house. Officer Wright further testified that 50 unit-doses of heroin was a relatively large purchase for the Columbiana County Drug Task Force, and that to purchase such an amount during a drug-bust in 2005 was rare.

{¶9} On cross, Officer Wright said he believed the informant was working "for consideration." He agreed that when the informant went to Parson's house Thompson was not there. He conceded the informant received the package of heroin directly from Parson. Officer Wright explained that no arrests were made immediately after the controlled buy because the investigation was on-going and they wanted to have the option of using the informant in the future. He agreed that the packets of heroin were never tested for fingerprints, and that none of the money used in the controlled buy was recovered from Thompson or anyone else.

{¶10} Andrea Parson testified that she was acquainted with both Thompson and the informant, through her now-deceased husband who was a crack-cocaine addict. Thompson is also Parson's son's godfather and during 2005 Parson would periodically babysit Thompson's children. During the first week of March 2005, Parson said she was approached by the informant who told her he wanted to get in touch with Thompson to

purchase something from him. Parson then called Thompson and relayed this information. About a week later, Thompson contacted Parson and told her he was going out-of-town and asked if he could leave something at her house for the informant to pick up. Parson agreed. She said Thompson arrived at her house at approximately 2:00 AM on March 6, 2005, and came inside with a small, red, velvet box, which Parson then placed on her kitchen table. She said she knew the box contained drugs, but did not look inside. Parson did not recall whether anyone else was at her house when Thompson dropped off the drugs.

{¶11} On cross, Parson admitted her original story to police was somewhat different, in that she told them her daughter was home when Thompson dropped off the box; that her daughter had gone outside to retrieve the box; and that Thompson never entered her house. She insisted this earlier version of events was incorrect and claimed the version she presented on the stand was the accurate statement.

{¶12} Parson testified that the informant came to retrieve the contents of the box and to drop off payment the next morning. She said when the informant arrived, her daughter Ashley answered the door and Parson directed the informant to the kitchen where the box sat. She said the informant complained about Thompson's absence. Parson then attempted to reach Thompson by phone, first calling her niece, and then calling Thompson's girlfriend. Apparently the girlfriend advised Parson to keep calling Thompson's cell phone until he answered, which Parson did. Parson finally reached Thompson directly by phone and told him the informant was displeased he was not there and that the informant wanted to speak with him. Parson said that upon hearing this Thompson said: "I'm not talking to him," and hung up the phone. Parson said the informant then departed with some of the heroin, leaving the remainder on the counter with some money.

{¶13} Afterwards, Parson said she called Thompson and he came over quickly and retrieved the money, the remaining heroin and the red, velvet box. Parson said she was surprised Thompson arrived so quickly because it was her understanding that he was out-of-town. She said Thompson only stayed inside her house for several minutes.

**{¶14}** Parson admitted she was indicted on trafficking charges in connection with this incident and that she pled guilty to a lesser charge with a recommendation of lenient sentence in exchange for her cooperation and testimony against Thompson. She said she was originally facing a possible eight years imprisonment, but was ultimately sentenced to six months plus probation on an amended charge. At the time of trial, Parson had served five months in Marysville and had been granted judicial release. Parson testified she had no prior felonies, aside from the drug conviction in connection with this incident, and that she had a misdemeanor bad-check conviction.

**{¶15}** During Parson's testimony, the audio tape of the controlled buy was played for the jury over objections. Parson identified herself, the informant and her daughter as speakers on the tape. She also provided some commentary about what she said on the tape. Several times, Parson began to interpret what others were saying on the tape, but defense counsel objected. The trial court sustained the objections.

**{¶16}** On the tape, the informant can be heard telling Parson after he arrives: "Tell him next time he better have his ass here when we're doing this." Parson then offers to call "him," and her attempts to do so can be heard on the tape. At the end, the informant can be heard saying: "Tell him to be here on the next one" and "Tell him I'll be back."

**{¶17}** Detective Dan Downard, who is employed by the Lisbon Police Department and assigned to the Columbiana County Drug Task Force testified that in making preparations for the controlled buy, he expected to find Thompson at Parson's residence. Det. Downard's role during the controlled buy was to conduct surveillance outside of Parson's house. He took video of the front of Parson's house and also monitored the audio feed from the wire the informant wore while inside.

**{¶18}** Det. Downard observed the informant arrive at Parson's house and remain inside for approximately ten minutes. The video was played for the jury and Det. Downard identified the informant on the video. Det. Downard also identified Thompson on the video, and noted that Thompson arrived at Parson's house approximately fifteen minutes after the informant left. Det. Downard further testified that the Community Resource Center, a day-care center, is located in the City of East Liverpool within 1000

feet of Parson's residence. Subsequently, on the record, but outside the presence of the jury, defense counsel stipulated to the authenticity of the photocopy of the child care license for the Community Resource Center, but did not stipulate to the distance. This license was admitted as an exhibit. Notably, however, the effective date of the license is April 21, 2005, which is over a month after the alleged drug transaction took place at Parson's home.

{¶19} The State then recalled Officer Wright, who also identified Thompson on the video. He also testified he told another officer to measure the distance between Parson's home and the Community Resource Center with a laser device, which revealed a distance of approximately 560 feet.

{¶20} Finally, the State called Special Agent Erin Reed, who was the forensic chemist with the BCI who performed tests on the heroin in this case. She stated that her laboratory tests confirmed that the substance retrieved from Johnson was 50 unit-doses of heroin.

{¶21} The State rested its case and Thompson moved for acquittal pursuant to Crim.R. 29, which was overruled by the trial court. After conferring with counsel, Thompson declined to testify in his own defense.

{¶22} The defense then called one witness: Officer Wright. He testified that a search of the informant after the controlled buy revealed a cell phone which meant that the informant had the capability to get in contact with Thompson himself. Officer Wright agreed that Thompson was not present when the informant purchased the drugs. On cross-examination by the State, Officer Wright testified that in his opinion Thompson was conducting counter-surveillance in the area that morning.

{¶23} The defense rested its case and then moved again for acquittal which was overruled by the trial court. The jury began deliberations at 11:02 AM and several minutes later they sent the court a written question asking: "Is the child care license a renewal or the first license issued?" The court sent a written response stating: "There is no evidence on this point."

{¶24} After the lunch recess, the jury sent the court another written

correspondence requesting written transcripts of Parson's testimony and Officer Wright's testimony. The court responded: "I cannot provide you with any transcripts of the testimony of any witnesses. You must rely on your memories and any notes you may have taken."

{¶25} At 2:40 PM that same day, the jury sent a written communication stating: "As of this time we cannot reach a unanimous verdict, with no progress towards a decision." Both sides stated on the record that they had no objection to the court giving a *Howard* charge at that time, which the court then did. The jury deliberated for approximately one hour and ten minutes longer and at the end of the day notified the bailiff that they were still unable to reach a decision. The trial court told the jury they should return in the morning and deliberate further. The court stated that if after an hour's deliberation the next morning they were still unable to reach a verdict, then the court would consider discharging them at that time.

{¶26} After returning the next morning and deliberating for approximately forty minutes, the jury returned a verdict, finding Thompson guilty on the one count of drug trafficking in violation of R.C. 2925.03(A)(1), with the following findings: (1) that the amount of heroin was 50-unit doses, and (2) that the offense was not committed within the vicinity of a school. The jury was polled and then released.

{¶27} Over objections, the trial court proceeded immediately to sentencing. The trial court denied Thompson's request for a pre-sentence investigation (PSI). After hearing from the prosecutor, defense counsel and Thompson himself, the trial court sentenced Thompson to the maximum of five years imprisonment. The court informed Thompson about post-release control. The court issued a judgment entry of sentencing. This appointed appellate counsel filed a brief assigning errors and this court sustained Thompson's request to file his own brief assigning errors pro-se. For ease of analysis, we will address counsel and Thompson's pro se assignments intermingled and out of order.

### Evidentiary Issues

{¶28} In counsel's first assignment of error he asserts:

{¶29} "The trial court committed plain error in allowing substantial prejudicial

evidence to be admitted against Appellant which led to his conviction for drug trafficking, and said conviction was against the manifest weight of the evidence."

**{¶30}** This assignment of error has two components, the first of which concerns evidentiary issues. Therein counsel contends the trial court erred by admitting the audio tape of the controlled buy and by allowing Parson to interpret what was said on the tape as it was played for the jury. "The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶43, citing *State v. Issa* (2001), 93 Ohio St.3d 49, 64, 752 N.E.2d 904. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

**{¶31}** Counsel first asserts that the audio tape itself was erroneously admitted because it constitutes unauthenticated, prejudicial hearsay. Trial counsel did not object to the admission of the tape on these grounds, and therefore the argument is waived absent plain error. Use of the plain error doctrine requires an obvious error that affected substantial rights under exceptional circumstances. Crim.R. 52(B); *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. It cannot be utilized unless the outcome clearly would have been different if not for the error. *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043. Even so, plain error is a discretionary doctrine which may, but *need not,* be employed if warranted." (Emphasis sic.) *State v. Donald,* 7th Dist. No. 08 MA 154, 2009-Ohio-4638, at ¶68, citing *State v. Hughbanks,* 99 Ohio St.3d 365, 792 N.E.2d 1081, 2003-Ohio-4121, at ¶39.

**{¶32}** The trial court did not commit plain error by admitting the audio tape. First, the tape was properly authenticated. Evid.R. 901 governs authentication, stating: "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). "[T]he purpose behind authentication is to connect

the particular piece of evidence sought to be introduced to the facts in the case by giving some indication the evidence is relevant and reliable.  The ultimate decision on the weight to be given to that piece of evidence is left to the trier of fact."  *State v. Brown*, 151 Ohio App.3d 36, 2002-Ohio-5207, 783 N.E.2d 539, at ¶35.

{¶33} Evid. R. 901(B) provides a non-exhaustive list of "illustrations" of authentication or identification which conform with the requirements of this rule.  One such illustration is "voice identification," which means: "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."  Evid.R. 901(B)(5).

{¶34} "'Voice identification pursuant to Rule 901(B)(5) may be offered into evidence in one of several manners.  A witness may testify as to his opinion that a voice he heard on a particular occasion was that of a given person.  Alternatively, the evidence may consist of a tape recording that is played in the courtroom, accompanied by testimony of a witness who identifies the voice on the recording.'"  *State v. Nelson* (Nov. 21, 1997), 2d Dist. No. 96CA 134, at *1 (quoting Weissenberger's Ohio Evidence, T. 901.72, pp. 564-565).  See, also, *State v. Reno*, 4th Dist. No. 04CA2759, 2005-Ohio-1294, at ¶19; *State v. Gore* (Feb. 18, 1997), 10th Dist. No. 96APC05-606.  In this case, the recording of the controlled buy was played in the courtroom, and Parson identified her voice, along with the informant.  Therefore, there is no authentication problem.

{¶35} Second, the tape does not contain inadmissible hearsay.  This court has recently held that tape recordings of controlled drug buys are not considered hearsay. *State v. Kelley*, 179 Ohio App.3d 666, 2008-Ohio-6598, 903 N.E.2d 365, at ¶12-13, following, *State v. Sloan,* 8th Dist. No. 79832, 2002-Ohio-2669 and *State v. Campbell* (July 2, 1990), 5th Dist. No. CA-8060. The rationale behind this holding is that the confidential informant's statements on the tape are not offered to show the truth of the matters asserted, but rather to show context for the drug transaction. *Kelley* at ¶13. Here the informant's statements on the tape provided a context within which the jury could understand the exchange that took place between the informant and Parson.  Several

times, the informant makes reference to a third person involved in the transaction, but does not specifically name him. For example, the informant can be heard telling Parson after he arrives: "Tell him next time he better have his * * * here when we're doing this." At the end, the informant can be heard saying: "Tell him to be here on the next one" and "Tell him I'll be back." These statements were not hearsay since they were not offered to show the truth of the matters asserted, but rather to give context to the controlled buy. In other words, they merely add background to aid in the overall understanding of the incident.

{¶36} Moreover, even assuming arguendo the tape was improperly admitted, Thompson cannot show the outcome of trial would have been any different. There is evidence independent of the audiotape which supports Thompson's conviction. Parson testified that Thompson was the one who supplied the heroin that the informant subsequently purchased. Thompson was observed driving around Parson's neighborhood during the controlled buy. Finally, law enforcement witnessed, and captured on video Thompson arriving at Parson's house approximately soon after the informant left. Thus, the court did not commit plain error by admitting the audiotape.

{¶37} Counsel also argues it was improper for the trial court to allow Parson to translate or interpret what she heard on the tape as it was played for the jury during trial. He claims that since the informant did not testify at trial, Parson's testimony about what the informant said on the tape was inadmissible hearsay. However, Parson's testimony regarding the tape mainly consisted of her identification of the speakers on the tape and a brief explanation of what she herself said. Several times, Parson began to interpret what others were saying on the tape, and defense counsel objected. The trial court properly sustained the objections, after the second, stating specifically: "She can't interpret what somebody else is saying. Whatever the tape says, the tape says. The jury can hear it just as well as the rest of it [sic]."

{¶38} There are two other times where Parson testified about what the informant said on the tape, and defense counsel failed to object. The first occurred as follows:

{¶39} "Q. What is - - whose voice is that again? Your voice and [the informant's]

voice?

**{¶40}** "A. Yes.

**{¶41}** "Q: And what - - what did we just hear there, the conversation between you?

**{¶42}** "A: He asked me if it - - where was John [Thompson] at, it wasn't right.

**{¶43}** "Q. What did you offer?

**{¶44}** "A. I told him, 'I could call him, call John [Thompson].'"

**{¶45}** The second instance occurred as follows:

**{¶46}** "Q. The last thing he said to you was. "Tell him I'll be back?"

**{¶47}** "A. Yes.

**{¶48}** "Q. Tell who?

**{¶49}** "A. John [Thompson]."

**{¶50}** We conclude that allowing Parson to testify about what she heard on the tape in those instances does not amount to plain error. Thompson cannot show that the outcome of trial would have been different had Parson been prohibited from so testifying. As discussed supra there is evidence independent from this testimony that supports Thompson's conviction. Cf., *Kelley* at ¶16 (holding there was no plain error in trial court's decision to allow a detective to provide commentary about an audio recording of controlled buy as it was played for the jury, where the confidential informant did not testify.) Accordingly, the first part of counsel's first assignment of error is meritless.

### Sufficiency and Manifest Weight

**{¶51}** In the second part of his first assignment of error counsel argues that Thompson's conviction is against the manifest weight of the evidence.

**{¶52}** In Thompson's first pro-se assignment of error he asserts:

**{¶53}** "The evidence was insufficient to sustain a conviction for drug trafficking denial of due process [sic]."

**{¶54}** "Sufficiency of the evidence is the standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict." *State v. Smith* (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d

668. Thus, sufficiency is a test of adequacy. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith* at 113.

{¶55} Under a manifest weight standard, the appellate court, after "'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. This court's discretionary power to grant a new trial is exercised only in the exceptional case where the evidence weighs heavily against conviction. *Thompkins* at 387.

{¶56} Here the State presented sufficient evidence to convict Thompson of drug trafficking, i.e., that Thompson knowingly sold or offered to sell a controlled substance. R.C. 2925.03(A)(1). In this case, the controlled substance was 50 unit-doses of heroin. Looking at the evidence in the light most favorable to the State any rational trier of fact could have found Thompson guilty beyond a reasonable doubt. Parson testified that Thompson provided the 50 unit-doses of heroin, and that Thompson returned to Parson's house to retrieve the purchase-money the informant left there in exchange for the heroin. Accordingly, Thompson's first pro-se assignment of error is meritless.

{¶57} Nor is Thompson's conviction against the weight of the evidence. Counsel argues to the contrary, reasoning that Parson's testimony was not credible but key to linking Thompson to the drug sale. Parson had credibility issues. In exchange for her testimony against Thompson, she received favorable treatment in her own criminal case. Further, there are some inconsistencies in her story. Initially, Parson told police that her daughter went downstairs to retrieve the heroin from Thompson. At trial, however, she

stated that Thompson came into her house and placed the box of heroin on her kitchen counter and that no one else was home at the time. Importantly, Parson consistently testified that Thompson was the one who supplied the heroin which the informant subsequently came to her house and bought. Further, detectives testified they saw Thompson driving around Parson's neighborhood during the controlled buy, possibly to conduct counter-surveillance. Finally, law enforcement witnessed, and captured on video Thompson arriving at Parson's house approximately 20 minutes after the informant left.

{¶58} In the end, it was within the province of the jury to determine Parson's credibility. Inasmuch as the jury believed her testimony, it did not clearly lose its way so as to create a manifest miscarriage of justice. Accordingly, counsel's first assignment of error is meritless.

### The *Howard* Charge

{¶59} In counsel's second assignment of error, he asserts:

{¶60} "Given the substantial prejudicial and improper evidence presented against Appellant, the trial court erred in its rapid imposition of a *Howard* charge on the deadlocked jury, and further erred in its ultimate removal from the jury of their proper resolution of the matter in the form of a deadlock."

{¶61} In *State v. Howard* (1989), 42 Ohio St.3d 18, 537 N.E.2d 188, the Supreme Court of Ohio approved a supplemental charge to be given to a jury deadlocked as to judgment or acquittal. Deciding whether and when to give a *Howard* charge is within the sound discretion of the trial court. *State v. King* (Mar. 22, 2000), 7th Dist. No. 95 CA 163, at *5. In this case, trial counsel did not object to the charge as required by Crim.R. 30, and thus we review for plain error only. The trial court's version of the *Howard* charge in this case was as follows:

{¶62} "In a large portion of cases absolute certainty cannot be attained or expected. And although your verdict - - any verdict, must reflect the verdict of each individual juror, and not the acquiescence or - - the acquiescence and the conclusion of other jurors just to reach a verdict. Each question submitted to you must be examined with the proper regard and deference to the opinions of the other jurors. It is desirable

that this case be decided. You were selected in the same manner, from the same source, that any further jury would be. There's no reason to believe that this case would ever be submitted to a jury who is more capable, or more impartial, or more intelligent than you are. Likewise, there is no reason to believe that the evidence would be any more clearer [sic], whether there would be any more evidence than was produced by either side in this case. It is your duty to decide this case if you can conscientiously do so. I would like you to listen to the views of each other, with a disposition of being pursued. Don't hesitate to reexamine your views, and change your position if you are convinced it was erroneous. The jurors who vote for acquittal should consider whether their doubt is reasonable; considering it is not shared by others equally honest who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, those jurors for conviction should reconsider their positions and decide whether they might not reasonably doubt the correctness of a decision not concurred in by the other jurors."

{¶63} The above charge given by the trial court very closely mirrors the language suggested in the *Howard* decision. *Howard* at 25-26. In addition, the trial court in this case took the additional step of reiterating to the jury their right to remain deadlocked. After giving the *Howard* charge, the trial court continued:

{¶64} "Now I understand that it's conceivable after an additional length of time that honest differences of opinion may prevent an agreement upon a verdict, and if that condition exists then you may consider whether further deliberations will serve any useful purpose. I would like to send you back for some further deliberations, in light of asking you to reexamine each other's positions, whether it is for guilt or for acquittal. If you decide after that further period of time that you cannot reach an agreement upon a verdict, then you may ask again for the bailiff to return you to the courtroom and I will decide what to do from there."

{¶65} The charge given by the trial court in this case was not coercive nor did it otherwise run afoul of *Howard*. Therefore, there is no plain error with regard to the language of the charge.

{¶66} Appellate counsel further complains about the rapid imposition of the *Howard* charge in this case, in essence arguing it was premature. This court has previously held that the imposition of the *Howard* charge after four and a half hours was not an abuse of discretion. *King* at *5, citing *State v. Mason* (1998), 82 Ohio St.3d 144, 167, 694 N.E.2d 932 (upholding the imposition of a *Howard* charge to a deadlocked jury during the penalty phase of a capital case after four and a half hours). Other appellate districts have upheld the use of a *Howard* charge after less time. See, e.g., *State v. Witcher*, 6th Dist. No. L-06-1039, 2007-Ohio-3960 (two hours); *State v. Nutt*, 4th Dist. No. 06CA2926, 2007-Ohio-3031 (two hours); *State v. Smith*, 2d Dist. No. 19370, 2003-Ohio-903 (three hours).

{¶67} In this case, the court gave the jury the *Howard* charge after three and a half hours of deliberations, an hour of which was spent on the lunch recess and thus arguably may not be counted. Based on the precedent of this and other appellate districts, we conclude the imposition of the *Howard* charge here was not unduly premature, and thus does not rise to the level of plain error.

{¶68} Finally, counsel complains about the second set of instructions the trial court gave to the jury at the end of the first day of deliberations. As indicated, the jury began deliberations at 11:02 AM, indicated they were unable to reach a verdict at 2:33 PM, and the trial court responded with the *Howard* charge at 2:42 PM. After deliberating for approximately one hour and ten minutes longer, the jury told the bailiff it was still unable to reach a verdict. The trial court then gave the following instruction, to which trial counsel did not object:

{¶69} "Ladies and Gentlemen, I thank you for your efforts here today. Obviously, you've given this a lot of thought and a lot of - - it's not an easy task to decide a case such as this.

{¶70} "But it is important that the case be decided for everybody. To that extent I am going to ask you to go home tonight, think the matter over, and come back tomorrow morning and give one more try at this. And after an hour's deliberation tomorrow morning, if you can't come to an agreement, then I will consider discharging you at that

time.

**{¶71}** "But I think that if everybody sleeps on it overnight, people will have a fresher mind in the morning. I realize there won't be any different evidence, but I'd like to do that simply because everybody has gone to a lot of effort and put a lot of time in on this, and that might be wasted if we can't come to some decision."

**{¶72}** Counsel argues that the fact that the jury reached a verdict just forty minutes after reconvening the next morning demonstrates that this second set of instructions was unduly coercive. This argument is meritless. The trial court clearly instructed the jury that it would consider discharging them after an additional hour of deliberations the following morning. Although the court appeared to encourage the jury to reach a verdict, the court's instructions were not unduly coercive, and therefore did not contravene the principles espoused in *Howard*. Thus, the trial court did not commit plain error in giving the jury that second set of instructions. Accordingly, counsel's second assignment of error is meritless.

### Ineffective Assistance of Counsel

**{¶73}** Both counsel and Thompson, acting pro-se, raise ineffective assistance of trial counsel claims, but for different reasons. These claims will be discussed together.

**{¶74}** In counsel's third assignment of error he asserts:

**{¶75}** "Appellant sustained ineffective assistance of defense counsel, who failed to file pretrial motions to suppress prejudicial statements and unlawful evidence; failed to objet [sic] to same at trial; and failed to object to both the trial court's *Howard* charge and the court's refusal to accept the jury's resolution of deadlock."

**{¶76}** In Thompson's second pro-se assignment of error he asserts:

**{¶77}** "Defense counsel was ineffective in his assistance of Appellant."

**{¶78}** In order to demonstrate ineffective assistance of counsel, a defendant must show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373.

{¶79} To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶80} In his third assignment of error counsel argues that Thompson's trial counsel was ineffective because: (1) he did not file a pretrial motion to suppress, (2) he failed to object to the admission of the audio tape, and (3) he failed to object to the *Howard* charge.

{¶81} Regarding the first issue, counsel was not deficient in failing to file a motion to suppress the audio tape of the controlled buy. During a pretrial conference, Thompson did request that trial counsel file a motion to suppress on his behalf, but counsel declined, stating in open court that he advised the Defendant that he felt there was no evidence to be suppressed.

{¶82} "Failing to file a motion to suppress does not constitute ineffective assistance of counsel per se. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52, quoting *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305. To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶35." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, at ¶65.

{¶83} Thompson fails to argue on appeal under what theory the motion to suppress would have been predicated, and thus he cannot show it would have had a reasonable possibility of success. Counsel is not required to file meritless motions. See, e.g., *Kelley,* supra, at ¶76.

{¶84} Second, trial counsel was not deficient in failing to object to the admission of the audio tape on hearsay grounds. As discussed above, the audio tape in this case was properly authenticated by Parson. Further, the tape did not contain inadmissible hearsay.

{¶85} Finally, trial counsel was not deficient for failing to object to the *Howard* charge, as the trial court properly used the charge to instruct the deadlocked jury, the

charge used substantially similar language from the *Howard* decision, and further the trial court added additional language telling the jury of their right to remain deadlocked.

{¶86} In Thompson's second pro-se assignment of error he argues that trial counsel was deficient for failing to investigate the background of the informant. However, there is no support in the record for this allegation. Trial counsel did cross-examine the State's witnesses about the informant's background, from which it was adduced that the informant was a known drug-dealer, and that he was cooperating with investigators for consideration. It must be presumed that a properly licensed attorney executes his legal duty in an ethical and competent manner. See *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 17 OBR 219, 477 N.E.2d 1128. We presume in this instance that trial counsel provided competent representation with regard to his investigation of the informant. Accordingly, counsel's third assignment of error and Thompson's second pro-se assignment of error are meritless.

### Sentencing

{¶87} In his third pro-se assignment of error, Thompson asserts:

{¶88} "The sentence imposed in violation of the VIII Amendment to the U.S. Constitution ban on cruel and unusual punishment and appealable under O.R.C. 2953.08(A)(1)(A)."

{¶89} In this assignment of error, Thompson takes issue with the trial court's imposition of the maximum sentence. Although he couches this as a constitutional claim of cruel and unusual punishment, he also argues that the seriousness and recidivism factors contained in R.C. 2929.12 do not support the trial court's decision to impose the maximum sentence.

{¶90} Based upon the Ohio Supreme Court's decision in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, appellate courts review felony sentences under a two prong test. Under the first prong, appellate courts must "examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law." *Kalish* at ¶26. A sentence would be contrary to law if, for example, it were outside the

statutory range, decided pursuant to an unconstitutional statute, or in violation of a statute, including R.C. 2929.11 and 2929.12, which set forth principles and factors the court must consider prior to pronouncing a sentence. Id. at ¶13-15. If the sentence is not clearly and convincingly contrary to law, an appellate court moves to the second prong, and determines whether the trial court abused its discretion in its application of the sentencing factors and resulting sentencing determination. Id. at ¶17, 19-20.

{¶91} Both of Thompson's arguments fall within the first *Kalish* prong in that they deal with the sentencing court's compliance with the applicable rules and statutes in imposing the sentence. With regard to Thompson's constitutional argument, generally, "'a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment.'" *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, at ¶21, quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69, 30 O.O.2d 38, 203 N.E.2d 334, citing *Martin v. United States* (C.A.9, 1963), 317 F.2d 753 (overruled on other grounds, *United States v. Bishop* (1973), 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941); *Pependrea v. United States* (C.A.9, 1960), 275 F.2d 325; and *United States v. Rosenberg* (C.A.2, 1952), 195 F.2d 583.

{¶92} Here, Thompson was convicted of a third-degree felony, pursuant to R.C. 2925.03(A)(1), (C)(6)(d). "For a felony of the third degree, the prison term shall be one, two, three, four, or five years." R.C. 2929.14(A)(3). The trial court imposed the maximum sentence of five years in this case. Thus, Thompson's sentence does not constitute cruel and unusual punishment.

{¶93} With regard to Thompson's argument about the general guidance statutes, we note that the trial court in this case did not discuss the statutory principles and factors either at the hearing or in the sentencing entry. However, pursuant to this court's recent holding in *State v. James*, 7th Dist. No. 07 CO 47, 2009-Ohio-4392, reversal is not automatic where the sentencing court fails to provide reasons for its sentence or fails to state at sentencing or in a form judgment entry, that it has considered R.C. 2929.11 or 2929.12. Accord *State v. Ballard,* 7th Dist. No. 08 CO 13, 2009-Ohio-5472, at ¶71. Rather, a silent record creates a presumption that the trial court considered the proper

factors. *James* at ¶50. This presumption may be rebutted by affirmatively showing the trial court failed to consider the factors, or by demonstrating the chosen sentence is "strikingly inconsistent" with the applicable factors. *James* at ¶50 (adopting *State v. Sloane*, 2d Dist. Nos. 2005CA79, 2006CA75 at ¶20.)

**{¶94}** The record in the present case does not affirmatively show that the court refused to consider the proper principles and factors. Nor is the chosen sentence "strikingly inconsistent" with the applicable factors. As will be explained below, there is substantial evidence in the record for weighing the seriousness of the offense and the likelihood of recidivism in favor of the maximum sentence.

**{¶95}** As an initial matter, we note that in sentencing a defendant the trial court may consider a wealth of information, including but not limited to: the trial transcript, the defendant's prior arrests, crimes for which the defendant was acquitted, and otherwise inadmissible evidence including information that was suppressed prior to trial. *Ballard* at ¶80-81. Further although, R.C. 2919.12 lists many specific factors a trial court must consider, the court also has the discretion to consider factors not specifically listed in the statute. See R.C. 2929.12(B).

**{¶96}** Regarding the seriousness of Thompson's crime, there is evidence upon which the trial court could have reasonably relied to conclude the crime was more serious. Although Thompson was acquitted of the school specification, presumably because the effective date on the day-care license presented fell after the date the crime took place, the trial court could still properly consider other testimony about the proximity of the daycare. See *Ballard* at ¶82 (considering appellant's acquittal on a gross sexual imposition charge in deciding the likelihood of recidivism). To that end, Det. Downard testified that the Community Resource Center, a day-care center, is located within 1000 feet of Parson's residence. Officer Wright testified he told another officer to measure the distance between Parson's home and the Community Resource Center with a laser device, which revealed a distance of approximately 560 feet. The close proximity of the daycare and the potential for young children nearby the drug sale would support a determination that Thompson's crime was more serious.

**{¶97}** Further, Officer Wright further testified that 50 unit-doses of heroin was a relatively large purchase for the Columbiana County Drug Task Force, and that to purchase such an amount during a drug-bust in 2005 was rare, which also demonstrates the seriousness of the crime. In addition, the fact that Thompson utilized Parson as an intermediary demonstrates a level of sophistication and experience in his trafficking operation which could also support the conclusion that Thompson's crime was more serious. There is nothing in the record indicating the crime was less serious pursuant to R.C. 2929.12(C).

**{¶98}** With regard to the likelihood of recidivism, see R.C. 2929.12(D) and (E), admittedly there is no PSI in this case for us to examine. However, a trial court's denial of a request for a PSI does per se constitute error. Where, as here, the court does not intend to impose community control sanctions, it does not abuse its discretion by denying a request for a PSI. *State v. Myrick*, 8th Dist. No. 91492, 2009-Ohio-2030, at ¶22-27; see, also, R.C. 2947.06(A)(1); Crim.R. 32.2. Thus, although we would prefer the record contain a PSI, especially where there is little or no discussion of the reasoning behind a chosen sentence, we cannot conclude the trial court's denial of Thompson's request for a PSI constituted error in this instance.

**{¶99}** Looking to the information that emerged regarding Thompson's past during the trial and at the sentencing hearing, the trial court could have reasonably concluded recidivism was more likely. From the sentencing hearing it was adduced that Thompson had no prior felonies and one misdemeanor conviction. The prosecutor alleged that Thompson escaped full blame for that offense by allowing another individual to take responsibility, and that Thompson jumped bond for that offense and was later arrested attempting to board a cruise ship in Florida. Although there is no evidence in the record supporting the prosecutor's assertions, Thompson failed to object to or correct those statements during the hearing. Thompson also failed to demonstrate remorse for his crime during sentencing. See R.C. 2929.12(D)(5). Overall, we cannot conclude that Thompson's sentence was strikingly inconsistent with the applicable principles and factors. Based on the foregoing discussion, we likewise conclude that the trial court did

not abuse its discretion in selecting the maximum sentence in this case.  Thompson's third pro-se assignment or error is meritless.

## Conclusion

{¶100} All of Thompson's counseled and pro-se assignments of error are meritless. His conviction is not against the weight or sufficiency of the evidence. Trial counsel provided constitutionally effective assistance. The trial court did not commit plain error by admitting an audiotape of the controlled buy, by allowing a witness to testify about it, or by its imposition of a *Howard* charge to the deadlocked jury. With regard to the sentencing issue, we presume the trial court considered the R.C. 2929.11 and 2929.12 principles and factors in sentencing Thompson because the record does not affirmatively demonstrate a lack of consideration, nor is the chosen sentence strikingly inconsistent with the statutory factors. Thompson's sentence is not otherwise contrary to law or an abuse of discretion. Accordingly, the judgment of the trial court is affirmed.

Vukovich, P.J., concurs.

Waite, J., concurs.